IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JACK L. MARCHAND II, | § | |
| | § | No. 533, 2018 |
| Plaintiff Below, | § | |
| Appellant, | § | Court Below: Court of Chancery |
| | § | of the State of Delaware |
| v. | § | |
| | § | C.A. No. 2017-0586-JRS |
| JOHN W. BARNHILL, JR., GREG | § | |
| BRIDGES, RICHARD DICKSON, | § | |
| PAUL A. EHLERT, JIM E. KRUSE, | § | |
| PAUL W. KRUSE, W.J. RANKIN, | § | |
| HOWARD W. KRUSE, PATRICIA | § | |
| I. RYAN, DOROTHY MCLEOD | § | |
| MACINERNEY and BLUE BELL | § | |
| CREAMERIES USA, INC., | § | |
| | § | |
| Defendants Below, | § | |
| Appellee. | § | |

Submitted: April 24, 2019
Decided: June 18, 2019

Before **STRINE**, Chief Justice; **VALIHURA**, **VAUGHN**, **SEITZ**, and **TRAYNOR**, Justices, constituting the Court *en Banc*.

Upon appeal from the Court of Chancery. **REVERSED** and **REMANDED**.

Robert J. Kriner, Jr., Esquire (*Argued*), and Vera G. Belger, Esquire, CHIMICLES & TIKELLIS LLP, Wilmington, Delaware; Michael Hawash, Esquire, and Jourdain Poupore, Esquire, HAWASH CICACK & GASTON LLP, Houston, Texas, Attorneys for Appellant, Jack L. Marchand II.

Paul A. Fioravanti, Jr., Esquire (*Argued*), and John G. Day, Esquire, PRICKETT, JONES & ELLIOT, P.A., Wilmington, Delaware, Attorneys for Appellees, John W. Barnhill, Jr., Richard Dickson, Paul A. Ehlert, Jim E. Kruse, W.J. Rankin, Howard W. Kruse, Patricia I. Ryan, Dorothy McLeod MacInerney, and nominal defendant Blue Bell Creameries USA, Inc.



Srinivas M. Raju, Esquire, and Kelly L. Freund, Esquire, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, Attorneys for Appellees, Greg Bridges and Paul W. Kruse.

**STRINE**, Chief Justice:

Blue Bell Creameries USA, Inc., one of the country's largest ice cream manufacturers, suffered a *listeria* outbreak in early 2015, causing the company to recall all of its products, shut down production at all of its plants, and lay off over a third of its workforce. Blue Bell's failure to contain *listeria*'s spread in its manufacturing plants caused *listeria* to be present in its products and had sad consequences. Three people died as a result of the *listeria* outbreak. Less consequentially, but nonetheless important for this litigation, stockholders also suffered losses because, after the operational shutdown, Blue Bell suffered a liquidity crisis that forced it to accept a dilutive private equity investment.

Based on these unfortunate events, a stockholder brought a derivative suit against two key executives and against Blue Bell's directors claiming breaches of the defendants' fiduciary duties. The complaint alleges that the executives—Paul Kruse, the President and CEO, and Greg Bridges, the Vice President of Operations— breached their duties of care and loyalty by knowingly disregarding contamination risks and failing to oversee the safety of Blue Bell's food-making operations, and that the directors breached their duty of loyalty under *Caremark*.[1]

---

[1] *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch.1996) (Allen, C.); *see also* App. to Opening Br. at A67–68 (Verified Stockholder Derivative Action Complaint (Aug. 14, 2017)).

The defendants moved to dismiss the complaint for failure to plead demand futility.[2] The Court of Chancery granted the motion as to both claims. As to the claim against management, the Court of Chancery held that the plaintiff "failed to plead particularized facts that raise a reasonable doubt as to whether a majority of [Blue Bell's] Board could impartially consider a demand."[3] Although the complaint alleged facts sufficient to raise a reasonable doubt as to the impartiality of a number of Blue Bell's directors, the plaintiff ultimately came up one short in the Court of Chancery's judgment: the plaintiff needed eight directors for a majority, but only had seven.

As to the *Caremark* claim, the Court of Chancery held that the plaintiff did not plead any facts to support "his contention that the [Blue Bell] Board 'utterly' failed to adopt or implement any reporting and compliance systems."[4] Although the plaintiff argued that Blue Bell's board had no supervisory structure in place to oversee "health, safety and sanitation controls and compliance," the Court of Chancery reasoned that "[w]hat Plaintiff really attempts to challenge is not the existence of monitoring and reporting controls, but the effectiveness of monitoring

---

[2] App. to Answering Br. at B48–134 (Defendants' Opening Br. in Support of their Joint Motion to Dismiss (Oct. 30, 2017)); *see also* Court of Chancery Rule 23.1.
[3] *Marchand v. Barnhill*, 2018 WL 4657159, at *16 (Del. Ch. Sept. 27, 2018).
[4] *Id.* at *18.

and reporting controls in particular instances," and "[t]his is not a valid theory under . . . *Caremark*."[5]

In this opinion, we reverse as to both holdings.

We first hold that the complaint pleads particularized facts sufficient to create a reasonable doubt that an additional director, W.J. Rankin, could act impartially in deciding to sue Paul Kruse, Blue Bell's CEO, and his subordinate Greg Bridges, Blue Bell's Vice President of Operations, due to Rankin's longstanding business affiliation and personal relationship with the Kruse family.[6] According to the complaint, Rankin worked at Blue Bell for decades and owes his entire career to Ed Kruse, the current CEO's father, who hired Rankin as his administrative assistant in 1981 and promoted him five years later to the position of CFO, a position Rankin maintained until his retirement in 2014. In 2004, while serving as CFO, Rankin was elected to Blue Bell's board, and has served since then. Moreover, the complaint alleges that the Kruse family showed its appreciation for Rankin not only by supporting his career, but also by leading a campaign that raised over $450,000 to name a building at the local university after Rankin. Despite the defendants' contentions that Rankin's relationship with the Kruse family was just an ordinary

---

[5] *Id.*

[6] Because we hold that the complaint pleads particularized facts supporting a reasonable inference that Rankin could not be impartial as to suing a member of the Kruse family, we need not, and do not, reach that issue as to the other director whose impartiality the plaintiff challenges on appeal.

business relationship from which Rankin would derive no strong feelings of loyalty toward the Kruse family, these allegations are "suggestive of the type of very close personal [or professional] relationship that, like family ties, one would expect to heavily influence a human's ability to exercise impartial judgment."[7] Rankin's apparently deep business and personal ties to the Kruse family raise a reasonable doubt as to whether Rankin could "impartially or objectively assess whether to bring a lawsuit against the sued party."[8]

As to the *Caremark* claim, we hold that the complaint alleges particularized facts that support a reasonable inference that the Blue Bell board failed to implement any system to monitor Blue Bell's food safety performance or compliance. Under *Caremark* and this Court's opinion in *Stone v. Ritter*,[9] directors have a duty "to exercise oversight" and to monitor the corporation's operational viability, legal compliance, and financial performance.[10] A board's "utter failure to attempt to assure a reasonable information and reporting system exists" is an act of bad faith in breach of the duty of loyalty.[11]

---

[7] *Sandys v. Pincus*, 152 A.3d 124, 130 (Del. 2016).
[8] *In re Oracle Corp. Derivative Litig.*, 824 A.2d 917, 942 (Del. Ch. 2003).
[9] 911 A.2d 362 (Del. 2006).
[10] *Id.* at 364 (quoting *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 971 (Del. Ch.1996)); *see also In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 125 (Del. Ch. 2009) (Chandler, C.).
[11] *Caremark*, 698 A.2d at 971.

As a monoline company that makes a single product—ice cream—Blue Bell can only thrive if its consumers enjoyed its products and were confident that its products were safe to eat. That is, one of Blue Bell's central compliance issues is food safety. Despite this fact, the complaint alleges that Blue Bell's board had no committee overseeing food safety, no full board-level process to address food safety issues, and no protocol by which the board was expected to be advised of food safety reports and developments. Consistent with this dearth of any board-level effort at monitoring, the complaint pleads particular facts supporting an inference that during a crucial period when yellow and red flags about food safety were presented to management, there was no equivalent reporting to the board and the board was not presented with any material information about food safety. Thus, the complaint alleges specific facts that create a reasonable inference that the directors consciously failed "to attempt to assure a reasonable information and reporting system exist[ed]."[12]

---

[12] *Id.*

# I. Background[13]

## A. Blue Bell's History and Operating Environment

### i. History

Founded in 1907 in Brenham, Texas, Blue Bell Creameries USA, Inc. ("Blue Bell"), a Delaware corporation, produces and distributes ice cream under the Blue Bell banner.[14] By 1919, Blue Bell's predecessor was struggling financially. Blue Bell's board turned to E.F. Kruse, who took over the company that year and turned it around. Under his leadership, the company expanded and became profitable.[15]

E.F. Kruse led the company until his unexpected death in 1951.[16] Upon his death, his sons, Ed F. Kruse and Howard Kruse, took over the company's management. Rapid expansion continued under Ed and Howard's leadership.[17] In

---

[13] The facts come from the plaintiff's complaint, documents incorporated by reference into the complaint, and the Court of Chancery's opinion based on these same documents.

[14] Blue Bell Creameries USA, Inc. is a holding company. Its only assets are a 69.6 percent interest in Blue Bell Creameries, L.P., which actually produces and distributes ice cream, and a 100 percent interest in Blue Bell Creameries, Inc., the general partner of Blue Bell Creameries, L.P. Because the plaintiff is a stockholder of Blue Bell Creameries USA, the Court of Chancery requested supplemental briefing regarding the fiduciary duties of dual fiduciaries—because the holding company and the general partner have the same executives—and a board's responsibilities when its only asset is a majority stake in a subsidiary. App. to Opening Br. at A275–83 (Letter from Vice Chancellor Slights to counsel requesting supplement submissions (May 11, 2018)). But in its decision, the Court of Chancery sensibly and properly collapsed the enterprise for purposes of analyzing the complaint. *Marchand v. Barnhill*, 2018 WL 4657159, at *3 (Del. Ch. Sept. 27, 2018).

[15] App. to Opening Br. at A20 (Verified Stockholder Derivative Action Complaint (Aug. 14, 2017)).

[16] *Id.* at A20–21.

[17] *Id.* at A21.

6

2004, Ed Kruse's son, Paul Kruse, took over management, becoming Blue Bell's President and CEO.[18] Ten years later, in 2014, Paul Kruse also assumed the position of Chairman of the Board, taking the position from his retiring father.[19]

*ii. The Regulated Nature of Blue Bell's Industry*

As a U.S. food manufacturer, Blue Bell operates in a heavily regulated industry. Under federal law, the Food and Drug Administration ("FDA") may set food quality standards, require food manufacturing facilities to register with the FDA, prohibit regulated manufacturers from placing adulterated food into interstate commerce, and hold companies liable if they place any adulterated foods into interstate commerce in violation of FDA rules.[20] Blue Bell is "required to comply with regulations and establish controls to monitor for, avoid and remediate contamination and conditions that expose the Company and its products to the risk of contamination."[21]

Specifically, FDA regulations require food manufacturers to conduct operations "with adequate sanitation principles"[22] and, in line with that obligation, "must prepare . . . and implement a written food safety plan."[23] As part of a

---

[18] *Id.* at A28–29.
[19] *Id.*
[20] *See* 21 U.S.C. §§ 333, 341, 342, 350.
[21] App. to Opening Br. at A28 (Verified Stockholder Derivative Action Complaint (Aug. 14, 2017)).
[22] 21 C.F.R. § 110.80.
[23] *Id.* § 117.3.

manufacturer's food safety plan, the manufacturer must include processes for conducting a hazard analysis that identifies possible food safety hazards, identifies and implements preventative controls to limit potential food hazards, implements process controls, implements sanitation controls, and monitors these preventative controls. Appropriate corporate officials must monitor these preventative controls.[24]

Not only is Blue Bell subject to federal regulations, but it must also adhere to various state regulations. At the time of the *listeria* outbreak, Blue Bell operated in three states, and each had issued rules and regulations regarding the proper handling and production of food to ensure food safety.[25]

### B. Plaintiff's Complaint

With that context out of the way, we briefly summarize the plaintiff's well-pled factual allegations and the reasonable inferences drawn from them.

The complaint starts by observing that, as a single-product food company, food safety is of obvious importance to Blue Bell.[26] But despite the critical nature of food safety for Blue Bell's continued success, the complaint alleges that management turned a blind eye to red and yellow flags that were waved in front of it by regulators and its own tests, and the board—by failing to implement any system

---

[24] *Marchand v. Barnhill*, 2018 WL 4657159, at *9–11 (Del. Ch. Sept. 27, 2018).
[25] *Id.*
[26] App. to Opening Br. at A9 (Verified Stockholder Derivative Action Complaint (Aug. 14, 2017))

to monitor the company's food safety compliance programs—was unaware of any problems until it was too late.[27]

### i. The Run-Up to the Listeria Outbreak

According to the complaint, Blue Bell's issues began to emerge in 2009. At that time, Paul Kruse, Blue Bell's President and CEO, and his cousin, Paul Bridges, were responsible for the three plants Blue Bell operated in Texas, Oklahoma, and Alabama.[28] The complaint alleges that, despite being responsible for overseeing plant operations, Paul Kruse and Bridges failed to respond to signs of trouble in the run up to the *listeria* outbreak. From 2009 to 2013 several regulators found troubling compliance failures at Blue Bell's facilities:

- In July 2009, the FDA's inspection of the Texas facility revealed "two instances of condensation, one from a pipe carrying liquid caramel [that] was dripping into three gallon cartons waiting to be filled, and one dripping into ice cream sandwich wafers."[29] The FDA reported these observations directly to Paul Kruse, who assured the FDA that "condensation is treated by Blue Bell as a serious concern."[30]

- In March 2010, the Alabama Department of Health inspected the Alabama plant and "found equipment left on the floor and a ceiling in disrepair in the container forming room."[31]

- Two months later, in May 2010, the FDA returned to the Texas plant "and observed ten violations that were cited to Paul Kruse

---

[27] *Id.* at A9–11.
[28] *Id.* at A21.
[29] *Id.* at A25.
[30] *Id.* at A33.
[31] *Id.*

including, again, a condensation drip."[32] While the condensation drip persisted from the FDA's last inspection of the Texas plant, the FDA also observed "ripped and open containers of ingredients, inconsistent hand-washing and glove use and a spider and its web near the ingredients."[33]

- In July 2011, an inspection by "the Alabama Department of Public Health cited drips from a ceiling unit and pipelines, standing water, open tank lids and unprotected measuring cups."[34]

- Nine months later, in March 2012, an inspection of the Oklahoma facility revealed the plant's "'[f]ailure to manufacture foods under conditions and controls necessary to minimize contamination' and '[f]ailure to handle and maintain equipment, containers and utensils used to hold food in [sic] manner that protects against contamination.'"[35]

- That same month, in March 2012, "[t]he Alabama Department of Public Health required five changes" to the Alabama facility, "including instructions to clean various rooms and items, make repairs and [sic] after fruit processing to prevent contamination."[36] A year later, "in March 2013, the Alabama Department of Public Health again ordered cleaning and repairs and observed an uncapped fruit tank."[37] The Alabama Department of Public Health made similar observations in a July 2014 inspection.[38]

Regulatory inspections during this time were not the only signal that Blue Bell faced potential health safety risks. In 2013, "the Company had five positive tests"

---

[32] *Id.*

[33] *Id.* at A34.

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

for *listeria*,[39] and in January 2014, "the Company received a presumptive positive *[l]isteria* result reports from the third party laboratory for the [Oklahoma] facility on January 20, 2014 and the samples reported positive for a second time on January 24, 2014."[40]

Although management had received reports about *listeria*'s growing presence in Blue Bell's plants, the complaint alleges that the board never received any information about *listeria* or more generally about food safety issues. Minutes from the board's January 29, 2014 meeting "reflect no report or discussion of the increasingly frequent positive tests that had been occurring since 2013 or the third party lab reports received in the preceding two weeks."[41] Board meeting minutes from February and March likewise reflect no board-level discussion of *listeria*.[42]

During the rest of 2014, Blue Bell's problems accelerated, but the board remained uninformed about Blue Bell's problems. In April, "[t]he Company received further positive *[l]isteria* lab tests regarding [the Oklahoma facility]."[43] That same month, the company had three "positive coliform tests far above the known legal regulator limits."[44] Yet, minutes from the April board meeting reflected

---

[39] *Id.* at A49–50.
[40] *Id.* at A52.
[41] *Id.*
[42] *Id.* ("[T]here is no reference to *Listeria* or the lab reports in the minutes of the February or March 2014 meetings.").
[43] *Id.*
[44] *Id.* at A49–50.

11

no discussion of *listeria*. Instead, the minutes note only that the Oklahoma and Alabama facilities' "plant operations were discussed briefly" and that Bridges also discussed "a good report from the TCEQ [Texas Commission on Environmental Quality]."[45]

Over the course of 2014, Blue Bell received ten positive tests for *listeria*. According to the complaint, these positive tests "included repeated positive results from the Company's third party laboratory in 2014, on consecutive samples, evidencing the inadequacy of the Company's remedial methods to eliminate the contamination."[46]

Despite management's knowledge of the growing problem, the complaint alleges that this information never made its way to the board, and the board continued to be uninformed about (and thus unaware of) the problem. Minutes from the board's 2014 meetings are bereft of reports on the *listeria* issues. Only during the September meeting is sanitation discussed, when Bridges informed the board that "[t]he recent Silliker audit [Blue Bell's third-party auditor for sanitation issues in 2014] went well."[47] This lone reference to a third-party audit is the only instance,

---

[45] *Id.* at A170 (Minutes to April 29, 2014 board meeting).
[46] *Id.* at A49 (Verified Stockholder Derivative Action Complaint (Aug. 14, 2017)).
[47] *Id.* at A180 (Minutes to September 30, 2014 board meeting). *See also Marchand*, 2018 WL 4657159, at *6 n.72.

12

until the *listeria* outbreak forced the recall of Blue Bell's products, of *any* board-level discussion regarding food safety.

At this stage of the case, we are bound to draw all fair inferences in the plaintiff's favor from the well-pled facts. Based on this chronology of events, the plaintiffs have fairly pled that:

- Blue Bell had no board committee charged with monitoring food safety;

- Blue Bell's full board did not have a process where a portion of the board's meetings each year, for example either quarterly or biannually, were specifically devoted to food safety compliance; and

- The Blue Bell board did not have a protocol requiring or have any expectation that management would deliver key food safety compliance reports or summaries of these reports to the board on a consistent and mandatory basis. In fact, it is inferable that there was no expectation of reporting to the board of any kind.

In short, the complaint pleads that the Blue Bell board had made no effort at all to implement a board-level system of mandatory reporting of any kind.

### ii. The Listeria *Outbreak and the Board's Response*

Blue Bell's *listeria* problem spread in 2015. Starting in January 2015, one of Blue Bell's product tests had positive coliform levels above legal limits.[48] The same

---

[48] App. to Opening Br. at A49–50 (Verified Stockholder Derivative Action Complaint (Aug. 14, 2017)).

result appeared in February 2015.[49]  And by this point, the problem spread to Blue Bell's products and spiraled out of control.

On February 13, 2015, "Blue Bell received notification that the Texas Department of State Health Services also had positive tests for *[l]isteria* in Blue Bell samples."[50]  The Texas Department of State Health Services was alerted to these positive tests by the South Carolina Health Department.[51]  Company swabs at the Texas facility on February 19 and 21, 2015 tested positive for *listeria*.[52]  Yet despite these reports to management, Blue Bell's board was not informed by management about the severe problem.  The board met on February 19, 2015, following Blue Bell's annual stockholders meeting, but there was no *listeria* discussion.[53]

Four days later, Blue Bell initiated a limited recall.[54]  Two days after that, Blue Bell's board met, and Bridges reported that "[t]he FDA is working with Texas health inspectors regarding the Company's recent recall of products.  More information is developing and should be known within the next days or weeks."[55]  Despite two years of evidence that *listeria* was a growing problem for Blue Bell, this is the first time the board discussed the issue, according to the complaint and the

---

[49] *Id.*

[50] *Id.* at A36, A54.

[51] *Id.* at A54–55.

[52] *Id.*

[53] *Id.* at A55.

[54] *Marchand v. Barnhill*, 2018 WL 4657159, at *7 (Del. Ch. Sept. 27, 2018).

[55] App. to Opening Br. at A55 (Verified Stockholder Derivative Action Complaint (Aug. 14, 2017)).

incorporated board minutes. Instead of holding more frequent emergency board meetings to receive constant updates on the troubling fact that life-threatening bacteria was found in its products, Blue Bell's board left the company's response to management.

And the problem got worse, with awful effects. "In early March 2015, health authorities reported that they suspected a connection between human [*l*]*isteria* infections in Kansas and products made by Blue Bell's [Texas] facility."[56] The outbreak in Kansas matched a *listeria* strain found in Blue Bell's products in South Carolina. And by March 23, 2015, Blue Bell was forced to recall more products. Two days later, Blue Bell's board met and adopted a resolution "express[ing] support for Blue Bell's CEO, management, and employees and encourag[ing] them to ensure that everything Blue Bell manufacture[s] and distributes is a wholesome and good testing [sic] product that our consumers deserve and expect."[57]

Blue Bell expanded the recall two weeks later, and less than a month later, on April 20, 2015, Blue Bell "instituted a recall of all products."[58] By this point, the Center for Disease Controls and Prevention ("CDC") had begun an investigation and discovered that the source of the *listeria* outbreak in Kansas was caused by Blue

---

[56] *Id.* at A36.
[57] *Id.* at A56–57.
[58] *Id.* at A37.

15

Bell's Texas and Oklahoma plants.[59] Ultimately, five adults in Kansas and three adults in Texas were sickened by Blue Bell's products; three of the five Kansas adults died because of complications due to *listeria* infection.[60] The CDC issued a recall to grocers and retailers, alerting them to the contamination and warning them against selling the products.[61]

After Blue Bell's full product recall, the FDA inspected each of the company's three plants. Each was found to have major deficiencies. In the Texas plant, the FDA found a "failure to manufacture foods under conditions and controls necessary to minimize the potential for growth of microorganisms," inadequate cleaning and sanitizing procedures, "failure to maintain buildings in repair sufficient to prevent food from coming [sic] adulterated," and improper construction of the building that failed to prevent condensation from occurring.[62] Likewise, at the Oklahoma facility, "[t]he FDA found that the Company had been receiving increasingly frequent positive [*l*]*isteria* tests at [the Oklahoma facility] for over three years," failed "to manufacture and package foods under conditions and controls necessary to minimize the potential growth of microorganisms and contamination," failed to perform testing to ferret out microbial growth, implemented inadequate cleaning and

---

[59] *Id.* at A37–38.
[60] *Id.* at A37.
[61] *Id.*
[62] *Id.* at A38; *see also id.* at A77–80 (Food and Drug Administration Inspection Report for Blue Bell Creameries facility in Brenham, Texas (May 1, 2015)).

sterilization procedures, failed to provide running water at an appropriate temperature to sanitize equipment, and failed to store food in clean and sanitized portable equipment.[63]

Although the Alabama facility fared better, the FDA still found contamination and several issues, including the "failure to perform microbial testing where necessary to identify possible food contamination," "failure to maintain food contact surfaces to protect food from contamination by any source," and inadequate construction of the facility such that condensation was likely.[64]  Most of these findings, the complaint alleges, are unsurprising because similar deficiencies were found by the FDA and state regulators in the run up to the *listeria* outbreak, yet according to the FDA's inspection after the fact, it appeared that neither management nor the board made progress on remedying these deficiencies.

After the fact, various news outlets interviewed former Blue Bell employees who "claimed that Company management ignored complaints about factory conditions in [the Texas facility]."[65]  One former employee "reported [that] spilled ice cream was left to pool on the floor, 'creating an environment where bacteria

---

[63] *Id.* at A38–39 (Verified Stockholder Derivative Action Complaint (Aug. 14, 2017)); *see also id.* at A82–91 (Food and Drug Administration Inspection Record for Blue Bell Creameries facility in Broken Arrow, Oklahoma (Apr. 23, 2015)).

[64] *Id.* at A40–41 (Verified Stockholder Derivative Action Complaint (Aug. 14, 2017)); *see also id.* at A94–96 (Food and Drug Administration Inspection Report for Blue Bell Creameries facility in Sylacauga, Alabama (Apr. 30, 2015)).

[65] *Id.* at A35 (Verified Stockholder Derivative Action Complaint (Aug. 14, 2017)).

could flourish.'"[66] Another former employee described being "instructed to pour ice cream and fruit that dripped off his machine into mix to be used later."[67]

### iii. The Aftermath of the Listeria Outbreak

With its operations shuttered, Blue Bell faced a liquidity crisis. Blue Bell initially sought a more traditional credit facility to bridge its liquidity, but after Blue Bell director W.J. Rankin informed his brother-in-law, Bill Reimann, about Blue Bell's liquidity crunch, Blue Bell ended up striking a deal with Moo Partners, a fund controlled by Sid Bass and affiliated with Reimann.[68] Moo Partners provided Blue Bell with a $125 million credit facility and purchased a $100 million warrant to acquire 42% of Blue Bell at $50,000 per share.[69] As part of Moo Partners's investment conditions, Blue Bell also amended its certificate of incorporation to grant Moo the right to appoint one member of Blue Bell's board who would be entitled to one-third of the board's voting power (or five votes based on a then-10-member board).

After investing in Blue Bell, Moo named Reimann to Blue Bell's board, expanding the board to 11 members with Reimann possessing five votes.[70] In February 2016, Reimann suggested that the board separate the roles of CEO and

---

[66] Id.
[67] Id. at A35–36.
[68] Id. at A42–43.
[69] Id.
[70] Id. at A46.

18

Chairman (both held by Paul Kruse). The board voted to follow Reimann's recommendation at its February 18th meeting, but after Paul Kruse disagreed with the recommendation and threatened to resign as President and CEO if the split occurred, the board held another vote in which all members, except Reimann and Rankin, voted to restore the position of CEO and Chairman of the board.[71]

### C. The Court of Chancery Dismisses the Case

After requesting Blue Bell's books and records through a § 220 request, the plaintiff, a Blue Bell stockholder, sued Blue Bell's management and board derivatively, asserting two claims based on management's alleged failure to respond appropriately to the red and yellow flags about growing food safety issues and the board's violation of its duty of loyalty, under *Caremark*, by failing to implement any reporting system and therefore failing to inform itself about Blue Bell's food safety compliance. The Court of Chancery dismissed both claims, holding that the plaintiff failed to plead demand futility.

As to the first claim, the plaintiff alleges that Paul Kruse, Blue Bell's President and CEO, and Bridges, Blue Bell's Vice President of Operations, had breached their duties of loyalty and care by knowingly disregarding contamination risks and failing to oversee Blue Bell's operations and food safety compliance process.[72] "Because

---

[71] *Id.* at A57–59.

[72] *Id.* at A67 (asserting a "derivative claim for breach of fiduciary duties of loyalty and care for knowingly disregard of contammination [sic] risks and failure to oversee Blue Bell's operation and compliance").

directors are empowered to manage, or direct the management of, the business and affairs of the corporation," the plaintiff's complaint must allege facts suggesting that "demand is excused because the directors are incapable of making an impartial decision regarding such litigation."[73] The plaintiff's complaint claims that "[a] demand upon the Board of the Company to pursue claims against Paul Kruse and Bridges . . . would be futile" because "the Kruse family—of which both Paul Kruse and Bridges are members—ha[s] long dominated Blue Bell" and the majority of directors are "long-time employees and/or otherwise beholden and loyal to the Kruse family."[74]

But the Court of Chancery held that the plaintiff "failed to plead particularized facts to raise a reasonable doubt that a majority of the [Blue Bell board] members could have impartially considered a pre-suit demand."[75] Without belaboring the details of the Court of Chancery's thorough analysis, which is somewhat complicated due to the unusual structure of Blue Bell's board, we note that the court essentially ruled that the plaintiff came up one vote short. To survive the Rule 23.1 motion to dismiss, the complaint needed to allege particularized facts raising a reasonable doubt that directors holding eight of the 15 votes could have impartially

---

[73] *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993).

[74] App. to Opening Br. at A62 (Verified Stockholder Derivative Action Complaint (Aug. 14, 2017)).

[75] *Marchand v. Barnhill*, 2018 WL 4657159, at *2 (Del. Ch. Sept. 27, 2018).

considered a demand, but the court held that the plaintiff had done so for directors holding only seven votes.

One of the directors who the trial court held could consider demand impartially was Rankin, Blue Bell's recently retired former CFO. Although Rankin worked at Blue Bell for 28 years, the court emphasized that he was no longer employed by Blue Bell, having retired in 2014. As to the allegations that donations from the Kruse family resulted in a building at Blinn College being named for Rankin, the court noted that "the Complaint provide[d] no more specifics regarding the donation (i.e., who gave how much), and ma[de] no attempt to characterize the materiality of the gesture."[76] That failure, the Court of Chancery concluded, fell short of Rule 23.1's particularity requirement. Further, the court noted that Rankin voted against rescinding a board initiative to split the CEO and Chairman positions held by Paul Kruse.[77] In the court's view, that act was evidence that Rankin was not beholden to the Kruse family. Ultimately, the Court of Chancery concluded that the plaintiff's "allegation that Rankin lacks independence falls flat."[78]

The Court of Chancery also rejected the plaintiff's second claim that Blue Bell's directors breached their duty of loyalty under *Caremark* by failing to "institute

---

[76] *Id.* at *15.
[77] *Id.*
[78] *Id.*

a system of controls and reporting" regarding food safety.[79] In support of this claim, the plaintiff asserted, based on the facts alleged in the complaint and reasonable inferences from those facts, that: (1) the Blue Bell board had no committee overseeing food safety; (2) Blue Bell's board did not have any reporting system in place about food safety; (3) management knew about the growing *listeria* issues but did not report those issues to the board, further evidence that the board had no food safety reporting system in place; and (4) the board did not discuss food safety at its regular board meetings.

Rejecting the plaintiff's *Caremark* claim, the Vice Chancellor started by observing that "[d]espite the far-reaching regulatory schemes that governed Blue Bell's operations at the time of the [*l*]*isteria* contamination, the Complaint contains no allegations that Blue Bell failed to implement the monitoring and reporting systems required by the FDCA [Federal Food, Drug, and Cosmetic Act], FDA regulations or state statutes (or that it was ever cited for such a failure)."[80] In fact, the Court of Chancery concluded that "documents incorporated by reference in the Complaint reveal that Blue Bell distributed a sanitation manual with standard operating and reporting procedures, and promulgated written procedures for

---

[79] App. to Opening Br. at A68–69 (Verified Stockholder Derivative Action Complaint (Aug. 14, 2017)).
[80] *Marchand*, 2018 WL 4657159, at *11.

22

processing and reporting consumer complaints."[81]  And at the board level, the Vice Chancellor noted that "[b]oth Bridges and Paul Kruse . . . provided regular reports regarding Blue Bell operations to the . . . Board," including reports about audits of Blue Bell's facilities.[82]

Based on Blue Bell's compliance with FDA regulations, ongoing third-party monitoring for contamination, and consistent reporting by senior management to Blue Bell's board on operations, the Court of Chancery concluded that there was a monitoring system in place.  At bottom, the Court of Chancery opined that "[w]hat Plaintiff really attempts to challenge is not the *existence* of monitoring and reporting controls, but the *effectiveness* of monitoring and reporting controls in particular instances."[83]  That, the Court of Chancery held, does not state a *Caremark* claim.  As a result, the court held that demand was not excused as to the *Caremark* claims and dismissed the complaint.

The plaintiff timely appealed from that dismissal.

---

[81] *Id.* at *17.
[82] *Id.*
[83] *Id.* at *18 (emphasis in original).

## II.  Analysis

We review a motion to dismiss for failure to plead demand futility *de novo*.[84]

### A.  *Rankin's Independence*

We first address the plaintiff's claim that the Court of Chancery erred by holding that the complaint did not allege particularized facts that raise a reasonable doubt as to whether directors holding a majority of the board's votes could impartially consider demand as to the management claims.  The Court of Chancery concluded that four directors representing eight votes were independent and that seven directors representing seven votes were not independent.  On appeal, the plaintiff challenges the Court of Chancery's conclusion as to only Rankin and one other director, Paul Ehlert.  Holding that the Court of Chancery erred as to either director would be dispositive.  Because we hold that Rankin was not independent for demand futility purposes, we reverse and need not and do not address whether Ehlert was independent.

On appeal, both parties agree that the *Rales* standard applies,[85] and we therefore use it to determine whether the Court of Chancery erred in finding that a majority of the board was independent for pleading stage purposes.  "[A] lack of

---

[84] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048 (Del. 2004) ("This Court reviews de novo a decision of the Court of Chancery to dismiss a derivative suit under Rule 23.1.").

[85] *See Rales v. Blasband*, 634 A.2d 927, 932–34 (Del. 1993).

independence turns on 'whether the plaintiffs have pled facts from which the director's ability to act impartially on a matter important to the interested party can be doubted because that director may feel either subject to the interested party's dominion or beholden to that interested party."[86] When it comes to life's more intimate relationships concerning friendship and family, our law cannot "ignore the social nature of humans" or that they are motivated by things other than money, such as "love, friendship, and collegiality."[87]

The standard for conducting this inquiry at the demand futility stage is well balanced, requiring that the plaintiff plead facts with particularity, but also requiring that this Court draw all reasonable inferences in the plaintiff's favor.[88] That is, the plaintiff cannot just assert that a close relationship exists, but when the plaintiff pleads specific facts about the relationship—such as the length of the relationship or

---

[86] *Sandys v. Pincus*, 152 A.3d 124, 128 (Del. 2016) (quoting *Del. Cty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1024 n.25 (Del. 2015)).

[87] *In re Oracle Corp. Derivative Litig.*, 824 A.2d 917, 938 (Del. Ch. 2003) ("Delaware law should not be based on a reductionist view of human nature that simplifies human motivations on the lines of the least sophisticated notions of the law and economics movement."); *see also Sanchez*, 124 A.3d at 1022 ("Close friendships of that duration are likely considered precious by many people, and are rare. People drift apart for many reasons, and when a close relationship endures for that long, a pleading stage inference arises that it is important to the parties.").

[88] *Sanchez*, 124 A.3d at 1022 ("In that consideration, it cannot be ignored that although the plaintiff is bound to plead particularized facts in pleading a derivative complaint, so too is the court bound to draw all inferences from those particularized facts in favor of the plaintiff, not the defendant, when dismissal of a derivative complaint is sought.").

details about the closeness of the relationship—then this Court is charged with making all reasonable inferences from those facts in the plaintiff's favor.[89]

From the pled facts, there is reason to doubt Rankin's capacity to impartially decide whether to sue members of the Kruse family. For starters, one can reasonably infer that Rankin's successful career as a businessperson was in large measure due to the opportunities and mentoring given to him by Ed Kruse, Paul Kruse's father, and other members of the Kruse family. The complaint alleges that Rankin started as Ed Kruse's administrative assistant and, over the course of a 28-year career with the company, rose to the high managerial position of CFO.[90] Not only that, but Rankin was added to Blue Bell's board in 2004,[91] which one can reasonably infer was due to the support of the Kruse family. Capping things off, the Kruse family spearheaded charitable efforts that led to a $450,000 donation to a key local college, resulting in Rankin being honored by having Blinn College's new agricultural facility named after him.[92] On a cold complaint, these facts support a reasonable inference that there are very warm and thick personal ties of respect, loyalty, and affection between Rankin and the Kruse family, which creates a reasonable doubt

---

[89] *Id.* (holding that at the pleading stage this Court is "bound to draw all inferences from those particularized facts in favor of the plaintiff, not the defendant, when dismissal of a derivative complaint is sought").

[90] App. to Opening Br. at A17–18 (Verified Stockholder Derivative Action Complaint (Aug. 14, 2017).

[91] *Id.*

[92] *Id.*

that Rankin could have impartially decided whether to sue Paul Kruse and his subordinate Bridges.

Even though Rankin had ties to the Kruse family that were similar to other directors that the Court of Chancery found were sufficient at the pleading stage to support an inference that they could not act impartially in deciding whether to cause Blue Bell to sue Paul Kruse,[93] the Court of Chancery concluded that because Rankin had voted differently from Paul Kruse on a proposal to separate the CEO and Chairman position, these ties did not matter.[94] In doing so, the Court of Chancery ignored that the decision whether to sue someone is materially different and more important than the decision whether to part company with that person on a vote about corporate governance, and our law's precedent recognizes that the nature of the decision at issue must be considered in determining whether a director is independent.[95] As important, at the pleading stage, the Court of Chancery was bound

---

[93] *Marchand v. Barnhill*, 2018 WL 4657159, at *14–15 (Del. Ch. Sept. 27, 2018) (holding that two directors who both worked at Blue Bell for most, if not all, of their entire careers were beholden to the Kruse family and therefore not independent for demand futility).

[94] *Id.* at *15.

[95] *See Sandys v. Pincus,* 152 A.3d 124, 134 (Del. 2016) ("Causing a lawsuit to be brought against another person is no small matter, and is the sort of thing that might plausibly endanger a relationship."); *Sciabacucchi v. Liberty Broadband Corp.*, 2018 WL 3599997, at *14 (Del. Ch. July 26, 2018) ("It is reasonable to infer that, if Zinterhofer voted to authorize a derivative suit against Malone, the relationship between Searchlight and Liberty Global might be in jeopardy. After all, '[c]ausing a lawsuit to be brought against another person is no small matter, and is the sort of thing that might plausibly endanger a relationship.'"); *In re Oracle Corp. Derivative Litig.*, 824 A.2d 917, 940 (Del. Ch. 2003) ("In evaluating the independence of a special litigation committee, this court must take into account the extraordinary importance and difficulty of such a committee's responsibility. It is, I daresay, easier to say no to a friend, relative, colleague, or boss

27

to accord the plaintiff the benefit of all reasonable inferences, and the pled facts fairly support the inference that Rankin owes an important debt of gratitude and friendship to the Kruse family for giving him his first job, nurturing his progress from an entry level position to a top manager and director, and honoring him by spearheading a campaign to name a building at an important community institution after him. Although the fact that fellow directors are social acquaintances who occasionally have dinner or go to common events does not, in itself, raise a fair inference of non-independence,[96] our law has recognized that deep and long-standing friendships are meaningful to human beings and that any realistic consideration of the question of independence must give weight to these important relationships and their natural effect on the ability of the parties to act impartially toward each other. As in cases like *Sandys v. Pincus*[97] and *Delaware County Employees Retirement Fund v. Sanchez*,[98] the important personal and business

---

who seeks assent for an act (*e.g.,* a transaction) that has not yet occurred than it would be to cause a corporation to sue that person. This is admittedly a determination of so-called 'legislative fact,' but one that can be rather safely made. Denying a fellow director the ability to proceed on a matter important to him may not be easy, but it must, as a general matter, be less difficult than finding that there is reason to believe that the fellow director has committed serious wrongdoing and that a derivative suit should proceed against him.") (footnotes omitted).

[96] *See Beam ex rel. Martha Stewart Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1051–52 (Del. 2004).

[97] 152 A.3d 124, 130 (Del. 2016) (holding that owning an airplane with the interested party "is suggestive of the type of very close personal relationship that, like family ties, one would expect to heavily influence a human's ability to exercise impartial judgment").

[98] 124 A.3d 1017, 1020–22 (Del. 2015) (holding that being "close personal friends for more than five decades" with the interested party gives rise to "a pleading stage inference . . . that it is important to the parties" and suggests that the director is not independent).

relationship that Rankin and the Kruse family have shared supports a pleading-stage inference that Rankin cannot act independently.

Because the complaint pleads particularized facts that raise a reasonable doubt as to Rankin's independence, we reverse the Court of Chancery's dismissal of the plaintiff's claims against management for failure to adequately plead demand futility.

### B. The Caremark Claim

The plaintiff also challenges the Court of Chancery's dismissal of his *Caremark* claim. Although *Caremark* claims are difficult to plead and ultimately to prove out,[99] we nonetheless disagree with the Court of Chancery's decision to dismiss the plaintiff's claim against the Blue Bell board.

Under *Caremark* and *Stone v. Ritter*, a director must make a good faith effort to oversee the company's operations.[100] Failing to make that good faith effort breaches the duty of loyalty and can expose a director to liability. In other words,

---

[99] *See Stone v. Ritter*, 911 A.2d 362, 372 (Del. 2006) ("[A] claim that directors are subject to personal liability for employee failures is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment.") (internal quotation marks omitted); *Guttman v. Huang*, 823 A.2d 492, 506 (Del. Ch. 2003) ("A *Caremark* claim is a difficult one to prove."); *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996) ("The theory here advanced is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment.").

[100] *Caremark*, 698 A.2d at 970 ("[I]t is important that the board exercise a good faith judgment that the corporation's information and reporting system is in concept and design adequate to assure the board that appropriate information will come to its attention in a timely manner as a matter of ordinary operations, so that it may satisfy its responsibility.").

for a plaintiff to prevail on a *Caremark* claim, the plaintiff must show that a fiduciary acted in bad faith—"the state of mind traditionally used to define the mindset of a disloyal director."[101]

Bad faith is established, under *Caremark*, when "the directors [completely] fail[] to implement any reporting or information system or controls[,] or . . . having implemented such a system or controls, consciously fail[] to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."[102]  In short, to satisfy their duty of loyalty, directors must make a good faith effort to implement an oversight system and then monitor it.

As with any other disinterested business judgment, directors have great discretion to design context- and industry-specific approaches tailored to their companies' businesses and resources.[103]  But *Caremark* does have a bottom-line requirement that is important: the board must make a good faith effort—*i.e.*, try—to

---

[101] *Desimone v. Barrows*, 924 A.2d 908, 935 (Del. Ch. 2007).

[102] *Stone*, 911 A.2d at 370–72.

[103] *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 125–26 (Del. Ch. 2009) (Chandler, C.) (noting that *Caremark* "does not eviscerate the core protections of the business judgment rule"); *Caremark*, 698 A.2d at 970 ("Obviously the level of detail that is appropriate for such an information system is a question of business judgment."); *Desimone*, 924 A.2d at 935 n.95 (noting that the approaches boards take to monitoring the corporation under their *Caremark* duty "will obviously vary because of the different circumstances corporations confront"); *see also Caremark*, 698 A.2d at 971 ("But, of course, the duty to act in good faith to be informed cannot be thought to require directors to possess detailed information about all aspects of the operation of the enterprise.  Such a requirement would simple [sic] be inconsistent with the scale and scope of efficient organization size in this technological age.").

put in place a reasonable board-level system of monitoring and reporting.[104] Thus, our case law gives deference to boards and has dismissed *Caremark* cases even when illegal or harmful company activities escaped detection, when the plaintiffs have been unable to plead that the board failed to make the required good faith effort to put a reasonable compliance and reporting system in place.[105]

For that reason, our focus here is on the key issue of whether the plaintiff has pled facts from which we can infer that Blue Bell's board made no effort to put in place a board-level compliance system. That is, we are not examining the effectiveness of a board-level compliance and reporting system after the fact. Rather, we are focusing on whether the complaint pleads facts supporting a reasonable inference that the board did not undertake good faith efforts to put a board-level system of monitoring and reporting in place.

---

[104] *Stone*, 911 A.2d at 370; *see also Caremark*, 698 A.2d at 971 ("Generally where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation, . . . only a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability.").

[105] *See, e.g.*, *Stone*, 911 A.2d at 372–73 (dismissing a *Caremark* claim despite the fact that the company violated the Bank Secrecy Act and was fined $50 million); *In re General Motors Derivative Litig.*, 2015 WL 3958724, at *1, 17 (Del. Ch. 2015) (dismissing a *Caremark* claim despite the fact that the company's actions "led to monetary loss on the part of the corporation, via fines, damages and punitive damages from lawsuits; reputational damage; and most distressingly, personal injury and death to GM customers"); *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d at 127 (dismissing a *Caremark* claim despite the fact that the company suffered billions of dollars in losses because of its exposure to subprime mortgages).

31

Under *Caremark*, a director may be held liable if she acts in bad faith in the sense that she made no good faith effort to ensure that the company had in place any "system of controls."[106] Here, the plaintiff did as our law encourages and sought out books and records about the extent of board-level compliance efforts at Blue Bell regarding what has to be one of the most central issues at the company: whether it is ensuring that the only product it makes—ice cream—is safe to eat.[107] Using these books and records, the complaint fairly alleges that before the *listeria* outbreak engulfed the company:

- no board committee that addressed food safety existed;

- no regular process or protocols that required management to keep the board apprised of food safety compliance practices, risks, or reports existed;

- no schedule for the board to consider on a regular basis, such as quarterly or biannually, any key food safety risks existed;

- during a key period leading up to the deaths of three customers, management received reports that contained what could be considered red, or at least yellow, flags, and the board minutes of the relevant period revealed no evidence that these were disclosed to the board;

---

[106] *Stone*, 911 A.2d at 370; *see also Caremark*, 698 A.2d at 971 ("Generally where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation, . . . only a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability.").

[107] Though, to be fair and completely accurate, Blue Bell does make a few other related products, such as frozen yogurt.

32

- the board was given certain favorable information about food safety by management, but was not given important reports that presented a much different picture; and

- the board meetings are devoid of any suggestion that there was any regular discussion of food safety issues.

And the complaint goes on to allege that after the *listeria* outbreak, the FDA discovered a number of systematic deficiencies in all of Blue Bell's plants—such as plants being constructed "in such a manner as to [not] prevent drip and condensate from contaminating food, food-contact surfaces, and food-packing material"—that might have been rectified had any reasonable reporting system that required management to relay food safety information to the board on an ongoing basis been in place.[108]

In sum, the complaint supports an inference that no system of board-level compliance monitoring and reporting existed at Blue Bell. Although *Caremark* is a tough standard for plaintiffs to meet, the plaintiff has met it here. When a plaintiff can plead an inference that a board has undertaken no efforts to make sure it is informed of a compliance issue intrinsically critical to the company's business operation, then that supports an inference that the board has not made the good faith effort that *Caremark* requires.

---

[108] App. to Opening Br. at A94–96 (Food and Drug Administration Inspection Report for Blue Bell Creameries facility in Sylacauga, Alabama (Apr. 30, 2015)).

In defending this case, the directors largely point out that by law Blue Bell had to meet FDA and state regulatory requirements for food safety, and that the company had in place certain manuals for employees regarding safety practices and commissioned audits from time to time.[109] In the same vein, the directors emphasize that the government regularly inspected Blue Bell's facilities, and Blue Bell management got the results.[110]

But the fact that Blue Bell nominally complied with FDA regulations does not imply that the *board* implemented a system to monitor food safety *at the board level*.[111] Indeed, these types of routine regulatory requirements, although important, are not typically directed at the board. At best, Blue Bell's compliance with these requirements shows only that management was following, in a nominal way, certain standard requirements of state and federal law. It does not rationally suggest that the board implemented a reporting system to monitor food safety or Blue Bell's operational performance. The mundane reality that Blue Bell is in a highly regulated

---

[109] Answering Br. at 28–29.

[110] Answering Br. at 28–29; *see also Marchand v. Barnhill*, 2018 WL 4657159, at *17 (Del. Ch. Sept. 27, 2018) ("[D]ocuments incorporated by reference in the Complaint reveal that Blue Bell distributed a sanitation manual with standard operating and reporting procedures, and promulgated written procedures for processing and reporting consumer complaints. Blue Bell engaged a third-party laboratory and food safety auditor to test for the presence of dangerous contaminates in its facilities.").

[111] *Stone*, 911 A.2d at 368 ("To the contrary, the *Caremark* Court stated, 'it is important that the *board* exercise a good faith judgment that the corporation's information and reporting system is in concept and design adequate to assure the *board* that appropriate information will come to its attention in a timely manner as a matter of ordinary operations, so that it may satisfy its responsibility.'") (quoting *Caremark*, 698 A.2d at 970) (emphasis added).

industry and complied with some of the applicable regulations does not foreclose any pleading-stage inference that the directors' lack of attentiveness rose to the level of bad faith indifference required to state a *Caremark* claim.

In answering the plaintiff's argument, the Blue Bell directors also stress that management regularly reported to them on "operational issues." This response is telling. In decisions dismissing *Caremark* claims, the plaintiffs usually lose because they must concede the existence of board-level systems of monitoring and oversight such as a relevant committee, a regular protocol requiring board-level reports about the relevant risks, or the board's use of third-party monitors, auditors, or consultants.[112] For example, in *Stone v. Ritter*, although the company paid $50

---

[112] *See, e.g.*, *City of Birmingham Ret. Sys. v. Good*, 177 A.3d 47, 59 (Del. 2017) (affirming the Court of Chancery's dismissal of a *Caremark* claim because "reports to the board showed that the board 'exercised oversight by relying on periodic reports' from the officers" and that board presentations "identified issues with the coal ash disposal ponds, but also informed the board of the actions taken to address the regulatory concerns"); *Stone*, 911 A.2d at 372–73 (affirming the Court of Chancery's dismissal of a *Caremark* claim, in part, because an outside auditor's report "reflect[s] that the Board received and approved relevant policies and procedures, delegated to certain employees and departments the responsibility for filing [suspicious activity reports] and monitoring compliance, and exercised oversight by relying on periodic reports from them"); *In re General Motors Derivative Litig.*, 2015 WL 3958721, at *14 (Del. Ch. 2015) (dismissing a *Caremark* claim where "GM *had* a system for reporting risk to the Board, but in the Plaintiffs' view it should have been a better system"); *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 127 (Del. Ch. 2009) (dismissing a *Caremark* claim because "[p]laintiffs do not contest that Citigroup had procedures and controls in place that were designed to monitor risk"); *Desimone v. Barrows*, 924 A.2d 908, 940 (Del. Ch. 2007) (dismissing a *Caremark* claim premised on the plaintiff's allegations that a properly formed and well-functioning audit committee must have known about options backdating despite the fact that management intentionally kept this information from the audit committee); *Guttman v. Huang*, 823 A.2d 492, 506–07 (Del. Ch. 2003) (dismissing a *Caremark* claim because the plaintiff failed to plead any particularized facts about the audit committee's lack of reporting or information systems).

million in fines related "to the failure by bank employees" to comply with "the federal Bank Secrecy Act,"[113] the"[b]oard dedicated considerable resources to the [Bank Secrecy Act] compliance program and put into place numerous procedures and systems to attempt to ensure compliance."[114] Accordingly, this Court affirmed the Court of Chancery's dismissal of a *Caremark* claim. Here, the Blue Bell directors just argue that because Blue Bell management, in its discretion, discussed general operations with the board, a *Caremark* claim is not stated.

But if that were the case, then *Caremark* would be a chimera. At every board meeting of any company, it is likely that management will touch on some operational issue. Although *Caremark* may not require as much as some commentators wish,[115] it does require that a board make a good faith effort to put in place a reasonable system of monitoring and reporting about the corporation's central compliance risks. In Blue Bell's case, food safety was essential and mission critical. The complaint pled facts supporting a fair inference that no board-level system of monitoring or reporting on food safety existed.

---

[113] 911 A.2d at 365–66.
[114] *Id.* at 371.
[115] *See, e.g.*, John Armour, et al., *Board Compliance*, 104 MINNESOTA L. REV. (forthcoming 2020) (manuscript at 47), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3205600; John Armour & Jeffrey N. Gordon, *Systemic Harms and Shareholder Value*, 6 J. LEGAL ANALYSIS 35, 46 (2014); Hillary A. Sale, *Monitoring* Caremark*'s Good Faith*, 32 DEL. J. CORP. L. 719, 753 (2007).

If *Caremark* means anything, it is that a corporate board must make a good faith effort to exercise its duty of care.  A failure to make that effort constitutes a breach of the duty of loyalty.  Where, as here, a plaintiff has followed our admonishment to seek out relevant books and records[116] and then uses those books and records to plead facts supporting a fair inference that no reasonable compliance system and protocols were established as to the obviously most central consumer safety and legal compliance issue facing the company, that the board's lack of efforts resulted in it not receiving official notices of food safety deficiencies for several years, and that, as a failure to take remedial action, the company exposed consumers to *listeria*-infected ice cream, resulting in the death and injury of company customers, the plaintiff has met his onerous pleading burden and is entitled to discovery to prove out his claim.

## III.  Conclusion

We therefore reverse the Court of Chancery's decision and remand for proceedings consistent with this opinion.

---

[116] *See Sandys v. Pincus*, 152 A.3d 124, 128 (Del. 2016) ("For many years, this Court and the Court of Chancery have advised derivative plaintiffs to take seriously their obligations to plead particularized facts justifying demand excusal.").