# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JAMES CLEM and ARTHUR KURAYEV, Derivatively on Behalf of WALGREENS BOOTS ALLIANCE, INC., | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2021-0240-LWW |
| JAMES A. SKINNER, STEFANO PESSINA, WILLIAM C. FOOTE, NANCY M. SCHLICHTING, GINGER L. GRAHAM, DAVID J. BRAILER, JANICE M. BABIAK, DOMINIC P. MURPHY, JOHN A. LEDERER, JOSÉ E. ALMEIDA, and LEONARD D. SCHAEFFER, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| -and- | ) ) | |
| WALGREENS BOOTS ALLIANCE, INC., a Delaware Corporation, | ) ) ) | |
| Nominal Defendant. | ) ) | |

## MEMORDANDUM OPINION

Date Submitted: November 20, 2023
Date Decided: February 19, 2024

Blake A. Bennett & Dean R. Roland, COOCH AND TAYLOR, P.A., Wilmington, Delaware; Brian J. Robbins, Stephen J. Oddo & Eric M. Carrino, ROBBINS LLP, San Diego, California; Leo Kandinov, Aaron T. Morris & Andrew W. Robertson,

MORRIS KANDINOV LLP, San Diego, California; *Counsel for Plaintiffs James Clem and Arthur Kurayev*

A. Thompson Bayliss, Samuel D. Cordle & Caleb Volz, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Robert G. Jones, Jessica M. Bergin & Sara A. Bellin, ROPES & GRAY LLP, Boston, Massachusetts; Martin J. Crisp, ROPES & GRAY LLP, New York, New York; *Counsel for Defendants James A. Skinner, Stefano Pessina, William C. Foote, Nancy M. Schlichting, Ginger L. Graham, David J. Brailer, Janice M. Babiak, Dominic P. Murphy, John A. Lederer, José E. Almeida, Leonard D. Schaeffer, and Nominal Defendant Walgreens Boots Alliance, Inc.*

**WILL, Vice Chancellor**

Over the past several years, *Caremark* suits have proliferated in Delaware. The few deemed viable concern severe corporate trauma and rely on board records suggesting a complete failure to oversee related core risks. Many, however, fall outside the narrow confines of the *Caremark* doctrine. Fueled by hindsight bias, they seek to hold directors personally liable for imperfect efforts, operational struggles, business decisions, and even when the corporation is the victim of a crime. The present lawsuit is an unexceptional member of this broader group.

Nominal defendant Walgreens Boots Alliance, Inc. is one of the largest retail pharmacy chains in the United States. Since its business is subject to a mass of laws and regulations, Walgreens maintains a multi-layered compliance infrastructure. The Audit Committee of Walgreens' board sits atop this program and routinely receives reports of compliance, legal, and regulatory matters.

The corporate trauma complained of concerns an issue well beneath the board's typical purview: billing practices for a single pharmaceutical product. Walgreens' retail pharmacy software was set to dispense a minimum of five insulin pens—the amount in the manufacturer's box. Since a patient might need fewer than five pens, unnecessary refill reminders and overbilling of third-party payers (including government health care programs) resulted. In 2016, Walgreens received a civil investigative demand regarding the practice and a government investigation ensued. In the fall of 2017, Walgreens learned that a related whistleblower action

1

had been filed. The Audit Committee was routinely kept apprised of these developments and Walgreens' response.

The plaintiffs' claim begins to deflate in view of the board's ongoing oversight. It collapses considering that the problem was remediated. Within months of learning about the whistleblower action, Walgreens changed its software to allow individual insulin pens to be dispensed. The plaintiffs' grievance that the board's response came too late and did too little is incompatible with bad faith—a necessary component of any *Caremark* claim.

Accordingly, none of Walgreens' directors face a substantial likelihood of liability for breaching their duty of loyalty. Demand is not excused. The defendants' motion to dismiss under Court of Chancery Rule 23.1 is granted.

## I. FACTUAL BACKGROUND

Unless otherwise noted, the following facts are drawn from the plaintiffs' Verified Stockholder Derivative Amended Complaint (the "Complaint") and the documents it incorporates by reference.[1]

---

[1] Verified S'holder Deriv. Am. Compl. for Breach of Fiduciary Duty and Unjust Enrichment (Dkt. 30) ("Am. Compl."); *see In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *1 (Del. Ch. Oct. 10, 2016) (explaining that the court may take judicial notice of "facts that are not subject to reasonable dispute" (citing *In re. Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006))); *Freedman v. Adams*, 2012 WL 1345638, at *5 (Del. Ch. Mar. 30, 2012) ("When a plaintiff expressly refers to and heavily relies upon documents in her complaint, these documents are considered to be incorporated by reference into the complaint.") (citation omitted).

### A. Walgreens' Retail Pharmacy Business

Nominal defendant Walgreens Boots Alliance, Inc. (the "Company"), a Delaware corporation, is a pharmacy-led health and well-being enterprise with locations across the United States and Europe.[2] It was formed in December 2014 after Walgreen Co.'s acquisition of Europe-based Alliance Boots.[3] Today, Walgreens is the second-largest retail pharmacy in the United States, with over 8,000 stores.[4] It operates a global pharmaceutical distribution network and is a major purchaser of prescription drugs and other health products.[5]

The distribution of prescription medications and pharmacy-related services is the cornerstone of Walgreens' business, accounting for more than 78% of Walgreens' overall sales in 2020.[6] Walgreens "relies significantly on private and

---

Exhibits to the Transmittal Declaration of Samuel D. Cordle, Esq. Pursuant to 10 *Del. C.* § 3927 in Support of the Walgreens Defendants' Opening Brief in Support of their Motion to Dismiss (Dkt. 39) and to the Transmittal Affidavit of Samuel D. Cordle, Esq. in Support of the Walgreens Defendants' Reply Brief in Support of their Motion to Dismiss (Dkt. 63) are cited as "Defs.' Ex. __." Exhibits lacking internal pagination are cited by the last three digits of their Bates stamps. Certain exhibits were produced in response to a pre-suit books and records demand pursuant to confidentiality agreements containing incorporation by reference provisions. *See* Defs.' Ex. 2 § 17; Defs.' Ex. 3 § 17; *see also Pettry ex rel. FedEx Corp. v. Smith*, 2021 WL 2644475, at *8 n.90 (Del. Ch. June 28, 2021) (noting that "Section 220 documents[] [were] incorporated by reference into the Complaint to the extent [they] directly dispute[d] [p]laintiff's conclusory assertion[s]").

[2] Am. Compl. ¶ 22.

[3] *Id.* ¶ 46.

[4] *Id.* ¶ 47.

[5] *Id.* ¶ 22.

[6] *Id.* ¶ 47.

3

governmental third-party payers" to compensate it for pharmaceutical care services.[7]

These third-party payers include federal programs like Medicare and Medicaid, which are responsible for a significant portion of Walgreens' revenues.[8]

As a pharmacy, Walgreens operates in a "complex, highly regulated environment."[9] It is subject to numerous laws, regulations, and administrative practices involving the operation of retail and wholesale pharmacies, "including regulations relating to [its] participation in Medicare, Medicaid and other publicly financed health benefit plans."[10] Walgreens has disclosed that "noncompliance with[] government regulations and other legal requirements," such as "false claims laws" and "applicable governmental payer regulations," could "have a material adverse effect on [its] reputation and profitability."[11]

### B. The Corporate Integrity Agreement

On June 4, 2008, Walgreens reached a $35 million settlement agreement with the United States Department of Justice (the "DOJ").[12] The settlement followed an

---

[7] *Id.* ¶ 48 (quoting 2017 Form 10-K).

[8] *Id.* Other governmental third-party payers include TRICARE and the workers' compensation program administered by the United States Department of Labor. *Id.*

[9] *Id.* ¶ 49 (quoting 2017 Form 10-K).

[10] *Id.* (quoting 2017 Form 10-K).

[11] *Id.* (quoting 2017 Form 10-K).

[12] *Id.* ¶ 103.

investigation into whether Walgreens had switched Medicaid beneficiaries from generic to brand name drugs.[13]

In connection with the settlement, Walgreens entered into a five-year corporate integrity agreement (the "CIA") with the Office of the Inspector General for the United States Department of Health and Human Services.[14] The CIA required Walgreens to conduct trainings on federal healthcare compliance, appoint a compliance officer to a monitoring role, and engage an independent review organization to audit compliance with government program requirements.[15] It also mandated that the Audit Committee of Walgreens' Board of Directors (the "Board") oversee federal healthcare program compliance, including through reports from a Company compliance officer, and "meet at least quarterly."[16] Walgreens' Code of Conduct was amended to reflect policy changes and requirements set by the CIA.[17]

Although the CIA expired on June 2, 2013, Walgreens maintained aspects of the compliance system it established. For example, the amended Code of Conduct remained in place and regular reporting from the Company's Chief Compliance

---

[13] *Id.*

[14] *Id.* ¶ 104; Am. Compl. Ex. E.

[15] Am. Compl. ¶¶ 104-06.

[16] *Id.* ¶ 105.

[17] Am. Compl. Ex. E at 4-6.

5

Officer to the Audit Committee about compliance risks continued.[18] Additionally, Walgreens engaged an outside advisor to develop a compliance governance model and prioritize risk-based focuses for the Company.[19]

## C. The *Qui Tam* Action

On July 21, 2015, a *qui tam* lawsuit (the "*Qui Tam* Action") was filed against Walgreens in the United States District Court for the Southern District of New York.[20] The complaint was filed under seal.

The plaintiffs alleged that Walgreens' insulin billing practices violated the federal False Claims Act (the "FCA") and other state false claims acts.[21] They complained that Walgreens' electronic management system—Intercom Plus—was programmed to dispense a minimum of five insulin pens (i.e., a single box), even if fewer pens were prescribed.[22] Government health care programs would allegedly deny Walgreens' reimbursement claims when the quantity of pens exceeded days of supply limits.[23] Pharmacists would then resubmit claims for the same pen quantity but edit the days of supply data.[24] The Intercom Plus system would automatically

---

[18] *See* Am. Compl. ¶¶ 123-37.

[19] *See id.* ¶¶ 123-25; *see also* Defs.' Ex. 12 (Jan. 2015 Audit Committee materials) at '752.

[20] Am. Compl. ¶¶ 8, 80.

[21] *Id.* ¶ 80.

[22] *See id.* ¶¶ 70-71.

[23] *Id.* ¶ 74; Am. Compl. Ex. B ("2019 Settlement Agreement") ¶ 2(i).

[24] Am. Compl. ¶ 74; 2019 Settlement Agreement ¶ 2(i).

apply the edited days of supply data to subsequent refills.[25]  According to the *qui tam* plaintiffs, this prompted premature refill reminders and unnecessary refills for government health care program beneficiaries.[26]

**D.    The CID**

In October 2016, the DOJ issued a civil investigative demand (the "CID") to Walgreens.[27]  The CID related to an FCA investigation into the same insulin pen dispensing and billing practices raised in the *Qui Tam* Action.[28]

Walgreens' Audit Committee was informed of the CID before meetings in late January 2017.[29]  Members received meeting materials including a "Legal Report" presentation that referenced a "Civil Investigative Demand in connection with a False Claims Act investigation concerning sales and marketing practices for certain insulin products."[30]  The Audit Committee materials were made available to the full Board.[31]

On January 25, 2017, the Audit Committee met and discussed "key legal and regulatory matters affecting, or that could affect, the Company and recent trends

---

[25] Am. Compl. ¶¶ 76-77; 2019 Settlement Agreement ¶ 2(k).

[26] Am. Compl. ¶¶ 75-76.

[27] *Id.* ¶¶ 9, 80.

[28] *Id.* ¶ 80.

[29] *Id.* ¶¶ 151, 153, 155 n.25.

[30] *Id.* ¶ 153.

[31] *Id.* ¶ 155 n.25.

related thereto."[32]  At a Board meeting the next day, the Audit Committee's Chair "reported on the Audit Committee meeting held the prior day, which included . . . [a] quarterly update on various compliance and legal matters."[33]

### E.    Ongoing Board Updates

The Audit Committee met six times between April 2017 and October 2017. At each meeting, the directors received updates on Walgreens' response to the CID.[34]  Minutes reflect that both the Company's General Counsel and Global Chief Administrative Officer "provided an overview of key legal and regulatory matters involving the Company."[35]   Audit Committee meeting materials specifically referenced the CID and described the status of Walgreens' response.[36]  And at each

---

[32] Defs.' Ex. 13 (Jan. 2017 Audit Committee minutes) at '490.

[33] Defs.' Ex. 14 (Jan. 2017 Board minutes) at '647.

[34] *E.g.*, Am. Compl. ¶¶ 156, 160-64, 166-67, 169.

[35] *E.g.*, Defs.' Ex. 15 (Apr. 2017 Audit Committee minutes) at '485; Am. Compl. ¶¶ 161, 166.

[36] Am. Compl. ¶¶ 153, 157-58, 162-63, 167; *e.g.*, Defs.' Ex. 15 (Apr. 2017 Audit Committee minutes) at '482 (noting that the Audit Committee's Chair "provided an update on the status of an informal regulatory investigation involving the Company").

Board meeting, an update was given on the prior day's Audit Committee meeting, including "reports from the compliance, legal, and internal audit groups."[37]

In October 2017, the Audit Committee first learned about the nature of the allegations in the *Qui Tam* Action. Materials for an October 23 Audit Committee meeting described the complaint as alleging that Walgreens "(a) refus[ed] to dispense insulin pens in quantities smaller than [the] number in the manufacturer's box; (b) manipulat[ed] higher 'days' supply' than authorized; and (c) compound[ed] overpayment through use of refill reminders."[38] The next day, the Board was updated on the Audit Committee meeting.[39]

The Audit Committee received a further update on the status of the *Qui Tam* Action and the DOJ investigation on January 17, 2018.[40] Meeting materials described the matters, referenced "Risk[s]" and "Estimated Loss[es]," and noted that "a meeting" (seemingly with the DOJ) was scheduled for January 18.[41] The next day, the full Board was told that the Audit Committee had "received a report

---

[37] *E.g.*, Defs.' Ex. 16 (Apr. 2017 Board minutes) at '656 (stating that the Audit Committee's Chair discussed "the Company's risk identification and mitigation activities"); Defs.' Ex. 28 (July 2017 Board minutes) at '400.

[38] Am. Compl. ¶ 167 (noting that this was the first time Audit Committee materials "linked the CID to the *Qui Tam* Action"); Defs.' Ex. 26 (Oct. 2017 Audit Committee materials) at '389.

[39] Am. Compl. ¶ 169.

[40] *Id.* ¶ 170.

[41] *Id.* (quoting Audit Committee materials).

9

from the Company's new Chief Compliance Officer" and "described certain matters discussed during his report."[42]

In early April 2018, Walgreens adjusted its Intercom Plus system to eliminate the default setting a full box of five insulin pens as the minimum dispensable quantity.[43]  On April 9, the Audit Committee met and again discussed the CID and the *Qui Tam* Action.[44]  The Board met on April 10 and—as usual—received an update about the prior day's Audit Committee meeting and on compliance, legal, and internal audit matters.[45]

### F.    The 2019 Settlement

On November 16, 2018, the relators in the *Qui Tam* Action filed an amended complaint under seal.[46]  On January 10, 2019, the DOJ filed a notice of its election to intervene.[47]  The amended complaint was unsealed on January 22, 2019.[48]

Concurrent with the complaint's unsealing, the DOJ announced a $209.2 million settlement with Walgreens (the "2019 Settlement").[49]  As part of the 2019

---

[42] *Id.* ¶ 171 (quoting Board minutes).

[43] *See id.* ¶ 176.  According to the amended *qui tam* complaint attached to the Complaint here, the Intercom Plus system was changed on April 1, 2018.  Am. Compl. Ex. A ¶ 57.

[44] Am. Compl. ¶ 173.

[45] *Id.* ¶ 174.

[46] *Id.* ¶ 80.

[47] *Id.*

[48] *Id.*

[49] *Id.* ¶ 81; *see generally* 2019 Settlement.

Settlement, Walgreens "admit[ted], acknowledge[d], and accept[ed] responsibility" for, among other things:

> [F]ederal health programs approv[ing] and pa[ying] a substantial number of claims submitted by Walgreens for insulin pen refills that the programs would not have approved if Walgreens had reported the days of supply for previous fills calculated according to the standard pharmacy billing formula of dividing the quantity dispensed by the daily dose.[50]

Additionally, Walgreens acknowledged that its practice of reporting days of supply for insulin pen prescriptions "based on payors' days of supply limit, instead of the calculation according to the standard pharmacy billing formula of dividing the quantity dispensed by the daily dose, prevented the [Intercom Plus refill] warning from functioning effectively to notify pharmacists regarding premature refills."[51]

Walgreens also entered into a corporate integrity agreement with the Office of the Inspector General for the United States Department of Health and Human Services.[52] The agreement mandated and codified various compliance practices. For example, it confirmed that the Audit Committee would remain responsible for overseeing Walgreens' compliance with federal healthcare program requirements.[53]

---

[50] 2019 Settlement ¶ 2(j).

[51] *Id.* ¶ 2(k).

[52] Am Compl. ¶ 86; Am. Compl. Ex. D (Walgreens' 2019 Corporate Integrity Agreement).

[53] Am Compl. ¶ 86; Am. Compl. Ex. D at 4-5.

## G. This Litigation

On March 19, 2021, plaintiff James Clem—a Walgreens stockholder—filed a derivative complaint in this court.[54] The suit followed Walgreens' production of books and records in response to a Section 220 demand.[55] After the defendants moved to dismiss, a two-count amended complaint was filed on October 8, 2021 that added Arthur Kurayev—another Walgreens stockholder—as a plaintiff.[56] The eleven individuals named as defendants are current and former directors and officers of Walgreens. Count I is a claim for breach of fiduciary duty against all defendants.[57] Count II is a claim for unjust enrichment against all defendants.[58]

On October 22, 2021, the defendants moved to dismiss the Complaint.[59] Briefing was completed on October 7, 2022.[60] The case was subsequently reassigned to me.[61] Argument on the motion to dismiss was held on November 20, 2023.[62] The matter was taken under advisement at that time.

---

[54] Dkt. 1.

[55] *See* Am. Compl. 1-2.

[56] Dkt. 30.

[57] Am. Compl. ¶¶ 208-15.

[58] *Id.* ¶¶ 216-19.

[59] Dkt. 33.

[60] *See* Dkts. 39, 61, 63.

[61] Dkt. 69.

[62] Dkts. 77-78.

## II.  LEGAL ANALYSIS

The defendants have moved to dismiss the Complaint under Court of Chancery Rule 23.1 for failure to plead demand excusal and under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.[63]  Because this is a derivative action through which the plaintiffs seek to usurp the Board's authority to control a corporate litigation asset, I begin with the parties' Rule 23.1 arguments.[64] The requirements of Rule 23.1 apply "at the threshold to prevent abuse and to promote intracorporate dispute resolution."[65]

Rule 23.1 mandates that a stockholder filing derivative claims "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors . . . and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[66]  The plaintiffs opted to forgo making a pre-suit demand on the Board.  Instead, they assert that doing so would be futile because,

---

[63] The Walgreens Defs.' Opening Br. in Supp. of Their Mot. to Dismiss Pls.' Verified S'holder Deriv. Am. Compl. (Dkt. 39) ("Defs.' Opening Br.") 1-2.

[64] *See FLI Deep Marine LLC v. McKim*, 2009 WL 1204363, at *2 (Del. Ch. Apr. 21, 2009) ("The decision to bring or to refrain from bringing suit on behalf of a corporation is the responsibility of the board of directors." (citing 8 *Del. C*. § 141(a))); *In re GoPro, Inc. S'holder Deriv. Litig.*, 2020 WL 2036602, at *8 (Del. Ch. Apr. 28, 2020) (observing that directors are "presumed" to have managerial authority over corporate affairs).

[65] *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[66] Ct. Ch. R. 23.1; *see Brehm*, 746 A.2d at 254 ("Rule 23.1 is not satisfied by conclusory statements or mere notice pleading.").

13

at the time the litigation was filed, a majority of the Board members could not impartially consider a demand.[67]

## A. The Demand Futility Standard

In evaluating whether a pre-suit demand is futile, the court "is confined to the well-pleaded allegations in the Complaint, the documents incorporated into the Complaint by reference, and facts subject to judicial notice."[68] The facts are considered "in their totality" and all reasonable inferences are drawn in the plaintiffs' favor.[69] The plaintiffs cannot rely on "'conclusory allegations' or 'inferences that are not objectively reasonable.'"[70]

The court must apply a three-part test that asks:

(i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;

(ii) whether the director faces a substantial likelihood of liability on any of the claims that are the subject of the litigation demand; and

(iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that is the subject of the litigation demand or who would face a

---

[67] Am. Compl. ¶ 188.

[68] *In re Kraft Heinz Co. Deriv. Litig.*, 2021 WL 6012632, at *4 (Del. Ch. Dec. 15, 2021) (citing *White v. Panic*, 783 A.2d 543, 546-47 (Del. 2001)), *aff'd*, 282 A.3d 1054 (Del. 2022) (TABLE).

[69] *Del. Cty. Empls. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1019 (Del. 2015).

[70] *In re GoPro*, 2020 WL 2036602, at *8.

substantial likelihood of liability on any of the claims that are the subject of the litigation demand.[71]

This inquiry is conducted on a "director-by-director" basis.[72] "If the answer to any of the questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile."[73]

## B.    The Demand Futility Analysis

"The court 'counts heads' of the members of a board to determine whether a majority of its members are disinterested and independent for demand futility purposes."[74] When this suit commenced, the Board had 12 members: defendants James A. Skinner, Stefano Pessina, William C. Foote, Nancy M. Schlichting, Ginger L. Graham, David J. Brailer, Janice M. Babiak, Dominic P. Murphy, John A. Lederer, and José E. Almeida, and non-parties Valerie Jarrett and Rosalind Brewer.[75] I refer to these directors as the "Demand Board."

The first and third prongs of the *Zuckerberg* test are not meaningfully in play. There is no allegation that the directors received a material personal benefit from the

---

[71] *United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021).

[72] *Khanna v. McMinn*, 2006 WL 1388744, at *14 (Del. Ch. May 9, 2006).

[73] *Zuckerberg*, 262 A.3d at 1059.

[74] *In re Zimmer Biomet Hldgs., Inc. Deriv. Litig.*, 2021 WL 3779155, at *10 (Del. Ch. Aug. 25, 2021), *aff'd*, 279 A.3d 356 (TABLE).

[75] Am. Compl. ¶¶ 23-36. Defendant Leonard D. Schaeffer left the Board in September 2019. *Id.* ¶ 33.

matter at issue.[76]  The plaintiffs allege that Brewer is not independent because she is the Company's CEO, and that Pessina and Skinner are similarly long-serving executives.[77]  The plaintiffs also maintain that Murphy lacks independence from Pessina, with whom he has a close business relationship.[78]  The independence of the other eight Demand Board members is uncontested.

That leaves the second *Zuckerberg* prong.  Because Walgreens has a Section 102(b)(7) exculpation provision in its charter, the plaintiffs must plead particularized facts raising a reasonable doubt that a majority of the Demand Board faces a substantial likelihood of unexculpated liability.[79]  The plaintiffs strive to meet this standard by arguing that the directors breached their duties of oversight.  This is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."[80]

In *Stone v. Ritter*, the Delaware Supreme Court outlined the two "necessary conditions predicate for director oversight liability: (a) the directors utterly failed to

---

[76] Although the plaintiffs allege generally that the directors received "substantial compensation" for their service, they make no suggestion that it constitutes a material personal benefit related to the challenged conduct.  *See id.* ¶¶ 197-98; *see also Simons v. Brookfield Asset Mgmt. Inc*, 2022 WL 223464, at *11 (Del. Ch. Jan. 21, 2022).

[77] Am. Compl. ¶¶ 23-24, 36, 187-89, 199.

[78] *Id.* ¶¶ 200-07.

[79] *See* Defs.' Ex. 17 (Walgreens' Amended and Restated Certificate of Incorporation) at art. VII; *see also Richardson ex rel. MoneyGram Int'l, Inc. v. Clark*, 2020 WL 7861355, at *9 (Del. Ch. Dec. 31, 2020).

[80] *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).

16

implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations . . . ."[81] These predicates are commonly known as prongs one and two of *Caremark*.[82] Under either formulation of the claim, the plaintiffs must adequately plead bad faith.[83] Only "a sustained or systematic failure of the board to exercise oversight . . . will establish the lack of good faith that is a necessary condition to liability."[84]

Although the Complaint invokes both prongs of *Caremark*, it lacks particularized allegations indicating that any of the director defendants operated with this state of mind.

### 1. The Prong One Claim

"Oversight duties arise from the duty of good faith, which is a subsidiary element of the duty of loyalty."[85] "[T]o satisfy their duty of loyalty, directors must

---

[81] 911 A.2d 362, 370 (Del. 2006).

[82] *See Constr. Indus. Laborers Pension Fund ex rel. SolarWinds Corp. v. Bingle*, 2022 WL 4102492, at \*6 (Del. Ch. Sept. 6, 2022), *aff'd*, 297 A.3d 1083 (Del. 2023) (TABLE).

[83] *See South ex rel. Hecla Mining Co. v. Baker,* 62 A.3d 1, 15 (Del. Ch. 2012); *In re ProAssurance Corp. S'holder Deriv. Litig.*, 2023 WL 6426294, at \*13-15 (Del. Ch. Oct. 2, 2023); *In re Boeing Co. Deriv. Litig.*, 2021 WL 4059934, at \*25 ("A showing of bad faith is a necessary condition to director oversight liability.").

[84] *Caremark*, 698 A.2d at 971.

[85] *Segway Inc. v. Cai*, 2023 WL 8643017, at \*3 (Del. Ch. Dec. 14, 2023) (citing *Marchand v. Barnhill,* 212 A.3d 805, 820-21 (Del. 2019)).

make a good faith effort to implement an oversight system and then monitor it."[86]

Liability may only attach when directors make no good faith "attempt to assure a reasonable information and reporting system exists."[87] Thus, a *Caremark* prong one claim requires a plaintiff to plead the absence of any good faith effort "to try" putting a board-level monitoring system in place.[88]

The plaintiffs' own allegations defeat any such claim against Walgreens' Board.[89] The Complaint acknowledges that the Audit Committee was tasked with overseeing "the Company's compliance with legal and regulatory requirements."[90] It details regular discussions of legal and regulatory compliance risks at Audit Committee and Board meetings.[91] It notes that the Company's Chief Compliance Officer, among others, regularly presented to the Audit Committee on compliance matters and risks.[92] It describes compliance programs that were implemented during

---

[86] *Marchand*, 212 A.3d at 821.

[87] *Caremark*, 698 A.2d at 971; *Firemen's Ret. Sys. of St. Louis ex rel. Marriott Int'l, Inc. v. Sorenson*, 2021 WL 4593777, at *12 (Del. Ch. Oct. 5, 2021) ("For directors to face liability under *Caremark*'s first prong, a plaintiff must show that the director made no good faith effort to ensure the company had in place any system of controls.") (citation omitted).

[88] *Marchand*, 212 A.3d at 821.

[89] *In re MetLife Inc. Deriv. Litig.*, 2020 WL 4746635, at *13 (Del. Ch. Aug. 17, 2020) (dismissing a *Caremark* prong one claim where the plaintiff conceded the existence of an "extensive network of internal controls" for monitoring compliance).

[90] Am. Compl. ¶ 139; *id.* ¶ 140; Defs.' Ex. 10 (Audit Committee charter) at '554.

[91] *See* Am. Compl. ¶¶ 109-18, 123-36, 151-74.

[92] *See e.g.*, *id.* ¶¶ 111, 115, 123-36, 161, 163, 166-68, 170, 173.

18

the five-year term of the CIA, after the CIA expired in 2013, and through the date of the 2019 Settlement.[93] The Board and Audit Committee documents incorporated by reference into the Complaint further reveal that the directors exercised and maintained oversight of Walgreens' compliance risks, including those related to government healthcare regulations.[94]

Despite these facts, the plaintiffs insist that the Board faces liability because Walgreens' internal controls were "[in]effective."[95] In the plaintiffs' estimation, the Board should have fulfilled its oversight duties differently by, for example, forming a dedicated FCA compliance committee.[96] But how directors choose to craft a monitoring system in the context of their company and industry is a discretionary matter.[97] The Board was required to exercise good faith oversight—not to employ a system to the plaintiffs' liking.[98] In any event, the reporting system *worked*. When

---

[93] *See id.* ¶¶ 104, 108, 123-37, 151-74.

[94] *See generally* Defs.' Ex. 13 (Jan. 2017 Audit Committee minutes); Defs.' Ex. 14 (Jan. 2017 Board minutes); Defs.' Ex. 15 (Apr. 2017 Audit Committee minutes); Defs.' Ex. 16 (Apr. 2017 Board minutes); Defs.' Ex. 26 (Oct. 2017 Audit Committee materials); Defs.' Ex. 27 (July 2017 Audit Committee materials); Defs.' Ex. 28 (July 2017 Board minutes).

[95] Am. Compl. ¶ 196.

[96] *Id.* ¶ 139.

[97] *Marchand*, 212 A.3d at 821 ("[A]s with any other disinterested business judgment, directors have great discretion to design context- and industry-specific approaches tailored to their companies' businesses and resources.").

[98] *In re Gen. Motors Co. Deriv. Litig.*, 2015 WL 3958724, at *15 (Del. Ch. June 26, 2015) (explaining that a claim asserting that the board "could have, should have, had a *better* reporting system" where the existence of "*some* oversight" was conceded did not state a *Caremark* claim).

potential problems with the insulin billing practice became apparent, information was conveyed to the Board.[99]

Unsurprisingly, the plaintiffs have effectively abandoned their prong one claim. They declined to respond to the defendants' arguments about its shortcomings.[100] And at oral argument, the plaintiffs' counsel conceded that their focused had shifted to whether the Board ignored red flags.[101] I will likewise turn my attention to *Caremark*'s second prong.

### 2. The Prong Two Claim

A *Caremark* prong two claim requires a plaintiff to plead that directors were presented with "red flags related to compliance with law and consciously disregarded" them.[102] Because bad faith is the touchstone for *Caremark* liability,

---

[99] Am. Compl. ¶¶ 155, 157-58, 162-64, 167, 169-71.

[100] The plaintiffs only generally aver that Walgreens failed to "implement, maintain and oversee an adequate and reasonable system of internal controls concerning [Walgreens'] compliance with the FCA and federal healthcare program requirements." Pls.' Opp. to Defs.' Mot. to Dismiss Pls.' Verified S'holder Deriv. Am. Compl. (Dkt. 61) ("Pls.' Opp. Br.") 55; *see Forsythe v. ESC Fund Mgmt. Co. (U.S.), Inc.*, 2007 WL 2982247, at *11 (Del. Ch. Oct. 9, 2007) (granting motions to dismiss where the plaintiffs "waived the[ir] claims by failing to brief them in their opposition to [a] motion to dismiss").

[101] Tr. of Nov. 20, 2023 Oral Arg. on Defs.' Mot. to Dismiss (Dkt. 78) 36 ("The Court: So are you pleading a prong one claim, or is it only a prong two claim? Plaintiffs' Counsel: I think the stronger allegations here are that there were red flags that were ignored . . . .").

[102] *MetLife*, 2020 WL 4746635, at *14; *see also Stone*, 911 A.2d at 371; *ProAssurance*, 2023 WL 6426294, at *15-16; *Okla. Firefighters Pension & Ret. Sys. ex rel. Citigroup, Inc. v. Corbat*, 2017 WL 6452240, at *16 (Del. Ch. Dec. 18, 2017).

the court's role is not to second-guess a board's response to a red flag. Claims that quibble with the timing or success of corrective action necessarily fail.[103]

The plaintiffs concede that in April 2018, Walgreens reprogrammed its Intercom Plus system to modify the default of dispensing a full box of insulin pens.[104] This change was made before the 2019 Settlement, and after the Audit Committee was repeatedly told about the CID and *Qui Tam* Action.

Despite this fatal flaw in their legal theory, the plaintiffs aver that the Board faces a substantial likelihood of liability for disregarding evidence that Walgreens was violating the FCA and governmental healthcare regulations.[105] They raise purported red flags that were allegedly ignored during two time periods: before the Board learned of the CID in January 2017, and after.[106] The first set is untethered from the particular wrongdoing at issue. The second set—insofar as it includes any red flags—was heeded.

---

[103] *See Horman v. Abney*, 2017 WL 242571, at *14 (Del. Ch. Jan. 19, 2017) (rejecting a claim where the allegations demonstrated that once a red flag was "waved in front of the Audit Committee, the Board responded"); *Sorenson*, 2021 WL 4593777, at *16 (dismissing a *Caremark* claim where the directors were informed that remedial actions were taken to address known data security issues though "the implementation plan was probably too slow"); *Richardson*, 2020 WL 7861335, at *11 (granting a motion to dismiss where the "[d]efendants acknowledge[d] that [corporate] services were being used to launder money and commit fraud" and "[i]n response, per the [p]laintiff's own allegations, . . . took action").

[104] Am. Compl. ¶¶ 11, 70, 159, 176.

[105] *See id.* ¶¶ 211-15.

[106] *See* Pls.' Opp. Br. 21-29.

### a.     Pre-January 2017 "Red Flags"

The plaintiffs allege that, before January 2017, the Board was aware of deficiencies in Walgreens' internal compliance system that emerged after the CIA expired.[107]  They cite to 2015 Audit Committee reports about perceived weaknesses in Walgreens' compliance program.  In January 2015, certain "gaps" in the program were identified by an outside advisor retained to assess and develop compliance-related initiatives.[108]  And in April 2015, the Audit Committee learned about "internal investigations [into] various billing practices and other employee conduct to determine if they resulted in improper billing to federal healthcare programs.[109] But there is no indication that these assessments concerned insulin billing practices. "General risks are not 'red flags' of a specific corporate trauma."[110]  Moreover, these facts reflect a Board that was engaging with its oversight function—not one that "decided to turn a blind eye to corporate wrongdoing."[111]

---

[107] *E.g.*, Am. Compl. ¶¶ 102, 108.

[108] *Id.* ¶¶ 136-37; Defs.' Ex. 12 (Jan. 2015 Audit Committee materials).

[109] Pls.' Opp. Br. 24 (citing Defs.' Ex. 30).  Notably, the plaintiffs' arguments about the April 2015 investigations are unpleaded.

[110] *City of Detroit Police & Fire Ret. Sys. ex rel. NiSource, Inc. v. Hamrock*, 2022 WL 2387653, at *25 (Del. Ch. June 30, 2022).

[111] *Sorenson*, 2021 WL 4593777, at *16 (dismissing a *Caremark* prong two claim where the board was "told about several recommendations that [an advisor] had made to appropriately update [the company's] standards and detailed [actions] to address those recommendations"); *see generally* Defs.' Exs. 13-16, 18, 21, 26-28, 31-33.  Further, if the 2015 investigation were a "red flag," it could only implicate the three members of the

22

The plaintiffs also point to the CIA and several prior settlements as red flags of FCA violations.[112] Some of the underlying matters, however, are unrelated to the FCA.[113] Others are unaccompanied by a suggestion that the Board knew of them.[114] And even if the settlements amount to red flags, they are not "sufficiently similar" to the wrongdoing challenged by the plaintiffs.[115] None of the cited settlements relate to insulin pens or Intercom Plus.[116]

The plaintiffs' tactic of relying on unrelated compliance issues or legal violations is insufficient. Walgreens—a global pharmacy with thousands of retail locations—is subject to numerous laws and regulations. The FCA alone is a broad statute that applies to various aspects of Walgreens' business, within which discrete billing practices are initiated for specific drugs. It cannot reasonably be inferred that,

---

Demand Board who were on the Audit Committee (Babiak, Brailer, and Schlichting). *See* Defs.' Ex. 30.

[112] Pls.' Opp. Br. 21-25, 30-31.

[113] *See* Am. Compl. ¶¶ 120-21.

[114] *Id.* ¶¶ 96, 98-99 (discussing three FCA settlements). The plaintiffs allege that the three members of the Audit Committee and Skinner learned about certain other settlements or investigations. *Id.* ¶¶ 109-10, 115-16. This leaves eight Demand Board members unaffected. *See Rojas ex rel. J.C. Penney Co., Inc. v. Ellison*, 2019 WL 3408812, at *10 (Del. Ch. July 29, 2019) ("Under Delaware law, red flags 'are only useful when they are either waved in one's face or displayed so that they are visible to the careful observer.'") (quoting *Wood v. Baum*, 953 A.2d 136, 143 (Del. 2008))).

[115] *See Melbourne Mun. Firefighters' Pension Tr. Fund v. Jacobs*, 2016 WL 4076369, at *8 (Del. Ch. Aug. 1, 2016) (observing that a board's failure to act must be "sufficiently similar to the misconduct implied by the 'red flags'").

[116] *See* Am. Compl. ¶¶ 96-99, 110, 116, 120-21.

23

for example, a 2008 settlement of claims that Walgreens "switched patients to different versions of [certain] prescription drugs" put the Board on notice of issues with a different billing system for a different drug (insulin).[117]  Knowledge of illegality in one corner of a vast business does not mean that directors were on notice of a distinct problem in another.[118]

        b.      Post-January 2017 "Red Flags"

The plaintiffs next contend that the Board's awareness of the CID in January 2017 put it on notice that Walgreens' insulin pen dispensing practice violated the FCA. "A CID is a kind of subpoena . . . that seeks documents or other information" from the issuing agency.[119]  The receipt of a lone subpoena or launch of a regulatory investigation does not necessarily show that directors knew the company was

---

[117] *Id.* ¶ 97.

[118] *See Hamrock*, 2022 WL 2387653, at * 25 ("This court has rejected the idea that 'alleged prior, *unrelated* wrongdoing would make directors sensitive to similar circumstances.'" (quoting *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 129 (Del. Ch. 2009))); *see also In re Dow Chem. Co. Deriv. Litig.*, 2010 WL 66769, at *13 (Del. Ch. Jan. 11, 2010) (concluding that a prior SEC settlement of bribery allegations was "too attenuated" from a later bribery matter to constitute a red flag where the second bribe "was paid for by different members of management in a different country, and for a different reason"); *MetLife*, 2020 WL 4746635, at *16 (determining that the plaintiffs' *Caremark* prong two claim required "too many attenuated inferences" that "the Board took th[e] knowledge of regulatory action and positive law violation and understood that the same infirmities could be present in 'administrative procedures in an analogous line of business'") (citation omitted).

[119] *Fisher ex rel. LendingClub Corp. v. Sanborn*, 2021 WL 1197577, at *3 (Del. Ch. Mar. 30, 2021).

breaking the law.[120]  It might not even indicate that the company was breaking the law in the first place.[121]  "The very purpose of an investigation is to discover whether there is evidence of non-compliance."[122]

Whether an investigation "become[s] a red flag depends on the circumstances."[123]  One brought amid "strong factual allegations of board knowledge of ongoing legal violations in the wake of federal government enforcement proceedings" may present a "red flag."[124]  The "obverse [is] also true."[125]

---

[120] *See id.* at \*12 (explaining that "the launch of a regulatory investigation does not 'necessarily demonstrate that a corporation's directors knew or should have known that the corporation was violating the law'" (quoting *Rojas*, 2019 WL 3408812, at \*11)); *In re Chemed Corp. S'holder Deriv. Litig.*, 2015 WL 9460118, at \*18 (D. Del. Dec. 23, 2015) (stating that subpoenas "do not on their own 'suggest that a board was aware of corporate misconduct—they suggest only that the board was aware that the company was under investigation'"), *report and recommendation adopted sub. nom. KBC Asset Mgmt. NV ex rel. Chemed Corp. v. McNamara*, 2016 WL 2758256 (D. Del. May 12, 2016).

[121] *See In re Universal Health Servs., Inc. Deriv. Litig.*, 2019 WL 3886838, at \*37 (E.D. Pa. Aug. 19, 2019) ("[T]he fact that the government opened an investigation . . . for potential violations of the False Claims Act does not mean that the company actually violated the False Claims Act or that the Board knew that any violations occurred.").

[122] *Okla. Firefighters Pension and Ret. Sys. v. Amazon.com, Inc.*, 2022 WL 1760618, at \*7 (Del. Ch. June 1, 2022) (observing, in the Section 220 context, that a governmental inquiry was not by itself sufficient evidence of possible wrongdoing since an investigation is a means to gather information).

[123] *Rojas*, 2019 WL 3408812, at \*11.

[124] *Id.* at \*13 (describing cases).

[125] *Id.* at \*11.

25

The Walgreens Board merely learned in January 2017 that the DOJ was investigating "sales and marketing practices for certain insulin products."[126] Despite the tangle of unrelated incidents described in the Complaint, there are no particularized allegations suggesting that the Board previously had reason to believe that these practices violated the law. It was not until October 2017—when the allegations in the *Qui Tam* Action became known—that the directors had another indication that Walgreens' insulin pen dispensing system might be problematic.[127]

Even if one could, through squinted eyes, perceive a red flag from the patchwork of events raised in the Complaint, the plaintiffs would fail to plead a *Caremark* claim. The necessary element of bad faith is wanting. The Audit Committee kept abreast of the Company's response to the CID.[128] It was updated on both the CID and the *Qui Tam* Action in January 2018. And by the time of its next meeting in April, the Intercom Plus program had been reprogrammed to remove

---

[126] Am. Compl. ¶ 153.

[127] *Id.* ¶ 167; *see* Defs.' Ex. 26 (Oct. 2017 Audit Committee materials) at '389 (describing the allegations in the *Qui Tam* Action).

[128] *See* Am. Compl. ¶ 157 (quoting Audit Committee materials stating that Walgreens had "started producing limited documentation in response to the CID"); *id.* ¶ 158 (quoting Audit Committee materials mentioning "Compliance Actions" "in connection with a False Claims Act investigation concerning sales and marketing practices for certain insulin products"); *id.* ¶ 162 (quoting Audit Committee materials stating: "Walgreens continues to respond to additional requests for information and follow-up CIDs. Walgreens has made certain employees available for deposition."); *id.* ¶ 163 (updating the Audit Committee on the response to the CID and DOJ investigation).

the five-pen default.[129]  The only inference I can reasonably draw from these facts is that the directors gathered information while the CID and *Qui Tam* Action unfolded and, in due course, remediation efforts were made.[130]

\* \* \*

*Caremark* and its progeny offer an enduring reminder that boards must endeavor to provide corporate oversight.  In the rare event that directors cross the red line of bad faith and trauma occurs, liability can arise.  But more harm than good comes about if *Caremark* claims are reflexively filed whenever a government investigation is announced, a class action lawsuit succeeds, or a big-dollar settlement is reached.  From a doctrinal perspective, this expansion risks weakening the "core protections of the business judgment rule."[131]  From a practical standpoint, it drains resources from the very corporations that derivative plaintiffs purport to represent.

---

[129] *Id.* ¶ 71; *see supra* note 43 and accompanying text.

[130] *See Smith*, 2021 WL 2644475, at \*9-10 (holding that directors' corrective action four years after learning of illegal conduct did not "support a reasonable inference of bad faith" but supported an inference that the "Board was engaged"); *see also id.* at \*9 ("To the extent the focus is on the manner and timing of the Board's response, that focus misses the mark for a *Caremark* claim."); *City of Birmingham Ret. & Relief Sys. v. Good*, 177 A.3d 47, 59 n.70 (Del. 2017) ("[T]he fact the board was aware of the [alleged problems] does not mean [it] consciously disregarded them—the presentations show that the board was regularly informed of [the company's] remedial actions . . . ."); *Corbat*, 2017 WL 6452240, at \*17.

[131] *In re Citigroup*, 964 A.2d at 125 (noting that lowering the bar for *Caremark* liability would "eviscerate the core protections of the business judgment rule—protections designed to allow corporate managers and directors to pursue risky transactions without the specter of being held personally liable if those decisions turn out poorly").

27

Unfortunately, this case presents a negative value proposition for all involved. The plaintiffs were aware, through the Section 220 production, that the Board maintained a compliance function to oversee central risks. They knew that actions were taken to fix the specific wrongdoing complained of.[132] Yet they filed litigation to hold the Board accountable for not addressing a government overbilling practice sooner—hardly the sort of risk that could trigger a calamity.[133] The only alleged injury is financial, which the plaintiffs compounded by imposing years of costly litigation on Walgreens.

There are no well pleaded facts placing in doubt the independence and disinterestedness of a majority of the Demand Board members. None of the director defendants face a substantial likelihood of liability for a *Caremark* claim.[134] The related unjust enrichment claim, which concerns the Board's standard compensation

---

[132] *See* Am. Compl. ¶¶ 71, 159, 176.

[133] *See MetLife*, 2020 WL 4746635, at *18 ("A failure to undertake immediate remediation of a reported defect, even where immediate action would be wise, is not evidence of bad faith unless it implies a need to act so clear that to ignore it implies a conscious disregard of duty."); *Conte ex rel. Skechers U.S.A., Inc. v. Greenberg*, 2024 WL 413430, at *8 (Del. Ch. Feb. 2, 2024) (discussing the need for board action (or inaction) based on the "magnitude or severity of risk").

[134] The Board could also have impartially considered whether to pursue a claim against the officer defendants (Pessina and Skinner). Neither Pessina nor Skinner is alleged to control Walgreens, and a majority of the Demand Board is not alleged to lack independence from them. *See In re Boeing*, 2021 WL 4059934, at *36 (dismissing a breach of fiduciary duty claim against officers where the plaintiffs did not plead "that any of the [d]irector [d]efendants are beholden to or dominated by the [company's] officers such that they would be unable to assess [the *Caremark* claim] regardless of the theory of liability").

28

during purported oversight failures, is equally frail.[135]  Demand was not futile, and the Complaint must be dismissed under Rule 23.1.

## III.  CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss is granted pursuant to Rule 23.1.  The Complaint is dismissed in its entirety.

---

[135] Am. Compl. ¶ 217; *see, e.g.*, *In re Clovis Oncology, Inc. Deriv. Litig.*, 2019 WL 4850188, at *17 (Del. Ch. Oct. 1, 2019) ("Where, as here, the underlying breach arises from a *Caremark* violation, it is difficult to discern how that breach would give rise to an enrichment, and [p]laintiffs have not well-pled that connection here.").